UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CALLTROL CORPORATION,<br>Plaintiff,<br>-against-<br>LOXYSOFT AB and LOXYSOFT INC.,<br>Defendants. | 18-CV-9026 (NSR)<br>OPINION & ORDER |

NELSON S. ROMÁN, United States District Judge

Plaintiff Calltrol Corporation ("Plaintiff") initiated this action on October 2, 2018, against LoxySoft AB and LoxySoft Inc. (together, "Defendants") (ECF Nos. 1 & 5, "Compl."). Before the Court is Defendants' motion to exclude the testimony and report of Plaintiff's damages experts, Kristin K. Kucsma, M.A., and A.E. Rodriguez, Ph.D. (Dfts.' Mot., ECF No. 176.) For the reasons stated herein, Defendants' motion is GRANTED in its entirety.

**BACKGROUND**

On December 19, 2025, Defendants moved to exclude the testimony and Report of Plaintiff's damages experts, Kristin K. Kucsma, M.A., and A.E. Rodriguez, Ph.D., of Sobel Tinari Economics Group (together, the "Experts"). ("Dfts.' Mot." & "Dfts.' Mem.," ECF Nos. 176–177; "Report," ECF No. 178-1.) Plaintiff opposed ("Pl.'s Opp.," ECF No. 180), and Defendants replied ("Dfts.' Reply," ECF No. 182).

## I. FACTUAL BACKGROUND

The following background is drawn from the Complaint, the Reseller Agreement, and the expert report submitted in connection with the instant motion and is undisputed unless otherwise noted.

Plaintiff sells call center software, hardware products, and related support services. (Compl. ¶ 13.) In March of 2002, Plaintiff and LoxySoft AB entered into a Reseller Agreement that granted LoxySoft AB a non-exclusive license to market and resell certain of Plaintiff's call center products. (*Id*. ¶¶ 10, 14.) Specifically, LoxySoft AB agreed to purchase contact center software products, software developer kits, and related support services from Calltrol. (*Id*. ¶ 15.) The Reseller Agreement states that "[d]uring the term of this Agreement" LoxySoft AB would "not directly or knowingly indirectly participate in the development or commercialization of software products competitive to the [Plaintiff's] Products." (*Id*. ¶ 16.) The Agreement had an initial two-year term and automatically renewed for successive one-year periods unless terminated. (*Id*. ¶¶ 17–18.) Either party could terminate the Agreement effective on the last day of the initial term or at the end of any renewal term by serving written notice at least ninety days before the effective date of termination. (Reseller Agreement § 7.1.)

Plaintiff alleges that Defendants began marketing and selling their own call center products and services ("Competing Products"), which directly competed with the products and services Defendants had previously purchased and resold from Plaintiff. (Compl. ¶ 20.) Plaintiff further alleges that Defendants did so without providing the written notice of termination required under the Agreement. (*Id*. ¶ 21.) By developing and selling the Competing Products while the Agreement remained in force, LoxySoft AB allegedly breached the Agreement's non-compete provision and deprived Calltrol of revenue it otherwise would have earned. (Compl. ¶¶ 19, 32, 34.)

To quantify the lost profits allegedly caused by that breach, Plaintiff retained the Experts. (*See generally* Report.) The Experts state that they were asked "to calculate pecuniary damages owed Calltrol as a result of defendant's actions," and that they limited their analysis "to profits lost by Calltrol as a result of defendant's actions," expressly excluding any analysis of Calltrol's

patents or exit strategy. (*Id.* at 3.) The Experts assumed liability and did not independently audit the figures or data provided to them. (*Id.* at 4.) They opine that Calltrol's damages range from $3,710,311 to $4,256,846.[1] (*Id.* at 2.)

The Report's damages calculation is based on what the Experts call the "Computer Telephony Integration Software Index," or "CTIS Index." (Report at 8–10.) The Experts created the CTIS Index from the publicly traded stock prices of four companies: eGain Corp., 8x8 Inc., Five9 Inc., and Enghouse Systems.[2] (*Id.* at 9.) The Report describes the CTIS Index as a "market performance metric based on publicly traded shares of the constituent firms" and that it "reflects what would have been Calltrol's performance but-for the events set forth in this matter." (*Id.* at 8.) The Experts then applied that index to Calltrol's historical income to "forecast Calltrol's lost income" and applied a smoothing filter the Report describes as a seven-year moving average (*Id.* at 10−12.) The Experts did not deduct projected costs because, in their view, Calltrol's cost of goods sold was negligible and the income at issue entailed intellectual property payments requiring no ongoing resources or activity. (*Id.* at 11.) As corroboration that the Index is representative, the Report reports a 0.97 correlation coefficient between LoxySoft's reported revenues for 2016 through 2023 and the but-for income the Index generates for Calltrol. (*Id.* at 13–14.)

Defendants now move to exclude the Report and the Experts' testimony in their entirety, challenging the reliability of the Experts' methodology. (Dfts.' Mem. at 1, 7−23.)

---

[1] The Experts propose two alternative damages periods, Scenario A (2013–2023) and Scenario B (2010–2023), yielding cumulative damages of $3,710,311 and $4,256,846, respectively. (Report at 2.) The Report defines damages as "the difference between plaintiff's actual revenue and the revenue that would have occurred but for the actions of defendant," (*id.* at 4), but its damages figures are identical to its smoothed but-for revenue figures, with no deduction for revenue actually received, (*id.* at 11–12). That makes no difference for 2013 forward, when Calltrol reported no income, but Scenario B's additional years assume damages of $199,686, $180,215, and $166,634 for 2010 through 2012, years in which Calltrol reported income of $160,917, $82,856, and $85,152. (*Id.* at 10–12.)

[2] According to the Report, two of the companies were identified in the record, while two others were selected because they shared the same NAICS classification as Calltrol. (*Id.* at 8-9.)

## II. PROCEDURAL HISTORY

Plaintiff filed its Complaint on October 2, 2018. (ECF Nos. 1 & 5.) On December 16, 2021, the Court granted in part and denied in part Defendants' motion to dismiss, dismissing Plaintiff's tortious interference and Lanham Act claims without prejudice and denying dismissal of Plaintiff's breach of contract claim against LoxySoft AB. (ECF No. 26.) Plaintiff voluntarily dismissed its unfair competition and New York General Business Law § 349 claims. (*See id*. at 1 n.1.) Plaintiff did not amend, and the tortious interference and Lanham Act claims were therefore deemed dismissed with prejudice. (ECF No. 27.) Plaintiff's sole remaining claim is breach of contract against LoxySoft AB.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. Under Rule 702, a qualified expert may testify if "the proponent demonstrates to the court that it is more likely than not" that the expert's specialized knowledge will assist the trier of fact, that the testimony is based on "sufficient facts or data," that the testimony is the product of "reliable principles and methods," and that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702, as construed by *Daubert v. Merrell Dow Pharm*., *Inc*., 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), requires the district court to act as a gatekeeper in determining whether expert testimony is reliable and relevant. *Daubert*, 509 U.S. at 597. Although *Daubert* originally addressed scientific testimony, its gatekeeping framework applies to technical and other specialized expert evidence as well. *Kumho*, 526 U.S. at 141.

As a threshold matter, the court must first determine whether the proposed witness is qualified as an expert based on "knowledge, skill, experience, training, or education." *Nimely v. City of New York,* 414 F.3d 381, 396 n.11 (2d Cir. 2005). If the witness lacks sufficient qualifications, the court need not reach the relevance or reliability analysis. *See Zaremba v. Gen. Motors Corp*., 360 F.3d 355, 360 (2d Cir. 2004) (finding that the *Daubert* reliability analysis was "almost superfluous" where expert had "meager qualifications to offer the opinions").

Once a witness is qualified, the core of the Rule 702 inquiry is reliability. The party proffering the expert bears the burden of demonstrating by a preponderance of the evidence that the testimony is reliable. *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 253 (S.D.N.Y. 2010) (citing *Zaremba*, 360 F.3d at 358); *Washington v. Kellwood Co*., 105 F. Supp. 3d 293, 303–04 (S.D.N.Y. 2015). In assessing reliability, the Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

Relevant reliability factors may include "(1) whether the theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique has been met with widespread acceptance." *Daubert*, 509 U.S. at 593−94. These factors, however, do not constitute a "definitive checklist or test." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). The Rule 702 inquiry is flexible, and "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141.

Finally, the court must determine whether the testimony is relevant. Specifically, whether it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Because Rule 702 favors admissibility, doubts about the usefulness of expert evidence should generally be resolved in favor of admission unless strong countervailing considerations warrant exclusion. *See United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007).

**DISCUSSION**

Defendants do not challenge the Experts' qualifications as forensic economists. Rather, they argue that the Experts' opinions fail each of Rule 702's remaining requirements: (1) the CTIS Index is not a reliable methodology, *see* Fed. R. Evid. 702(c) (Dfts.' Mem. at 7); (2) the Experts did not reliably apply their methodology to the facts of this case, *see* Fed. R. Evid. 702(d) (Dfts.' Mem. at 19); and (3) the opinions do not rest on sufficient facts or data, *see* Fed. R. Evid. 702(b) (Dfts.' Mem. at 13). Plaintiff responds that the Index is an accepted "yardstick" analysis, that the Experts permissibly relied on the data provided to them, and that Defendants' objections go to weight, rather than admissibility, of the evidence. (Pl.'s Opp. at 6−20.) The Court addresses each requirement in turn. Because the CTIS Index fails Rule 702(c), and because the Experts' damages figures are derived entirely from that Index, that defect alone requires exclusion of the Report and the Experts' testimony in their entirety. The Experts' failure to apply that methodology reliably to the facts of this case independently warrants exclusion under Rule 702(d), and the deficiencies in the data underlying their calculations under Rule 702(b) reinforce that conclusion.

## I. The CTIS Index Is Not the Product of Reliable Principles and Methods

Rule 702(c) requires that expert testimony be "the product of reliable principles and methods." Fed. R. Evid. 702(c). In evaluating a methodology, courts consider whether it can be

and has been tested, whether it has been subjected to peer review and publication, its known or potential rate of error, and whether it is generally accepted in the relevant field. *Daubert*, 509 U.S. at 593−94. A court may also exclude an opinion where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *accord Amorgianos*, 303 F.3d at 266.

The mechanics of the Experts' methodology are not in dispute. The Experts multiplied Calltrol's reported income in 2012 by the ratio of the CTIS Index value in each subsequent year to its index value in 2012 and treated the result as a forecast of Calltrol's lost income. (Report at 9−11; *see* Dfts.' Reply at 4 (setting out the calculation).) The resulting projections rise and fall based on the stock prices of four public companies. They do not reflect Calltrol's license sales, customers, pricing, or profits. That approach satisfies none of the Daubert benchmarks. Nothing in the record indicates that it can be or has been tested or that it carries a known rate of error, and Plaintiff has identified no peer-reviewed literature, treatise, or judicial authority approving the use of public-company stock prices to forecast the income of a small, privately held company. (Dfts.' Mem. at 7–8; Dfts.' Reply at 2.) Dr. Rodriguez testified that share value generally rises with sales (Rodriguez Tr. 26:3-14, Wrobel Decl. Ex. G, ECF No. 178-7), but that observation about public issuers does not establish that the same relationship holds for a two-employee private licensor like Calltrol. Moreover, the authorities Plaintiff cites — the Gaughan treatise and a law review article on yardstick damages — address comparisons based on the sales or profits of comparable firms, not their stock prices. (Pl.'s Opp. at 6-7.)

The methodology also fails on its own terms. Three of the four companies in the CTIS Index reported negative or stagnant net income over the same 2013−2023 period in which the Index projects Calltrol's income would grow severalfold. (Dfts.' Mem. at 9; Wrobel Decl. Ex. H,

ECF No. 178-8.) Plaintiff offers no response to that evidence. An index that does not track the profitability of its own constituent companies cannot serve as a reliable proxy for the profitability of Calltrol. This is an analytical gap of the kind described in *Joiner* and *Amorgianos*, rather than a question of the weight the evidence deserves. *Cf. Washington*, 105 F. Supp. 3d at 314−19 (admitting a yardstick analysis where the challenge concerned the quality of the supporting evidence).

The Report also does not analyze whether the four companies selected for the Index are actually comparable to Calltrol. The treatise on which Plaintiff relies states that an expert who uses the performance of other firms to estimate how the plaintiff would have performed must analyze those firms to determine whether they are truly comparable. (Gaughan, *Measuring Business Interruption Losses* at 57−59, Zimmerman Decl. Ex. 1, ECF No. 180-3.) Ms. Kucsma testified that she did not select the companies because she considered them "comparable to Calltrol," and that, apart from a shared NAICS classification, she could not identify what they had in common with Calltrol. (Kucsma Tr. 134:5−13, 147:9−13, Second Wrobel Decl. Ex. A, ECF No. 183-1.) She performed no analysis of the companies' profits or revenues and could not recall considering alternatives. (*Id.* at 131:22−25, 146:11−13.) The differences between the companies are substantial. Each constituent is a diversified, multinational company with subscription revenue; Calltrol had two employees and earned income only from discrete per-license sales. (Dfts.' Mem. at 10.) An expert who does not merely choose imperfect comparators but "utterly fail[s] to perform any substantive analysis of those factors most relevant to comparability" has not employed a reliable method. *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 342 (N.D.N.Y. 2021) (internal quotation marks omitted).

The additional analyses in the Report do not remedy these defects. (Report at 10–14.) The moving average reduces year-to-year volatility in the stock-price data, but the smoothed values are still stock prices.[3] Ms. Kucsma identified no Calltrol-specific factor that the filter measured or controlled for, only unspecified "market" and "industry" factors. (Kucsma Tr. 158:3–22, Wrobel Decl. Ex. B, ECF No. 178-2; Dfts.' Mem. at 12.)

As for the correlation, the Experts computed the 0.97 coefficient using LoxySoft's total revenues. Dr. Rodriguez testified that he did not know what portion of LoxySoft's market performance "was attributed to the call center," and, when shown a breakdown of LoxySoft's revenues by product line and asked whether he took the breakdown into consideration in developing his opinion, answered that he did not. (Rodriguez Tr. 46:2–6, 46:19–22, 47:16–19, Wrobel Decl. Ex. G, ECF No. 178-7; Dfts.' Mem. at 13.) A correlation computed without regard to which of LoxySoft's products competed with Calltrol's does not establish that the Index reflects the market for Calltrol's products. Plaintiff's contention that the correlation shows LoxySoft "capture[d] the entire market updraft" (Pl.'s Opp. at 10) presupposes that LoxySoft's aggregate growth consisted of sales that would otherwise have flowed to Calltrol. The coefficient shows only that LoxySoft's total revenues moved with the constituent companies' stock prices, not that the growth came from products that displaced Calltrol's. Neither analysis, therefore, establishes that the Index reliably measures Calltrol's but-for performance.

Plaintiff's remaining arguments are unpersuasive. In its opposition, Plaintiff describes the CTIS Index as a "Yardstick Analysis" and as a proxy for "lost enterprise value" derived through a Price-to-Sales multiple. (Pl.'s Opp. at 6−8.) Those terms appear nowhere in the Report, the

[3] The Report describes the filter as a "7-Year Moving Average" (Report at 10), though each smoothed value from 2013 forward is the mean of the preceding eight years. (Report at 11–12.) The 2023 figure of $816,087, for example, is the mean of the 2016 through 2023 values, and a seven-year window does not reproduce it. (*Id.*)

Experts' depositions, or Plaintiff's Rule 26(a) disclosures. (Dfts.' Reply at 3−4.) An expert's report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). The Court therefore evaluates only the methodology actually disclosed in the Report, not a description offered for the first time in briefing. In any event, even if a customized index can serve as an acceptable yardstick in an appropriate case, *see Washington*, 105 F. Supp. 3d at 311, the Report derives neither a Price-to-Sales nor an enterprise-value multiple. Moreover, Ms. Kucsma's testimony, quoted above, confirms that comparability played no role in selecting the Index's components. (Kucsma Tr. 134:5−13, 147:9−13.)

Nor does this Court's September 24, 2025, Opinion and Order concerning Defendants' expert assist Plaintiff. (Pl.'s Opp. at 4.) Plaintiff observes that the Order struck portions of Mr. Bates's report because he lacked economic expertise, and reasons that its own economists' analysis therefore satisfies Rule 702. (Opinion and Order at 9–10, ECF No. 161; Pl.'s Opp. at 4.) But qualifications and reliability are distinct requirements, and Defendants do not challenge the Experts' qualifications. The Order admitted Bates's technical opinions because they rested on a reasoned, experience-based methodology, leaving any weaknesses to cross-examination. (Opinion and Order at 12.) The Experts' methodology here has no comparable foundation, and its defects bear on admissibility, not weight. *See Amorgianos*, 303 F.3d at 266.

The CTIS Index, as the Experts applied it, is not the product of reliable principles and methods. Because the damages calculations are generated entirely from the Index, the Report and the Experts' testimony must be excluded.

## II. The Experts' Methodology Was Not Reliably Applied to the Facts of This Case

Even apart from the defects in the Index itself, the Experts did not apply their methodology reliably to the facts of this case. Rule 702(d) requires that the expert's opinion "reflect[] a reliable

application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Under New York law, which governs the Reseller Agreement, damages for breach of contract place the plaintiff in the position it would have occupied had the contract been performed. *See Chen v. Wen Fang Wang*, 177 A.D.3d 694, 695 (2d Dep't 2019). Expert testimony that rests on assumptions "so unrealistic and contradictory as to suggest bad faith" or amounts to "an apples and oranges comparison" should be excluded. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

The Experts' model does not measure the position Calltrol would have occupied under the parties' actual contract. Plaintiff acknowledges that the model assumes "that the parties to the Agreement acting in good faith would renegotiate the Agreement." (Pl.'s Opp. at 3 n.4.) Ms. Kucsma testified to the same effect that, absent the alleged breach, Calltrol might have "entered into some sort of alternative arrangement, perhaps some sort of rental agreement." (Kucsma Tr. 42:18−43:14, Wrobel Decl. Ex. B, ECF No. 178-2; Dfts.' Mem. at 22−23.) But nothing in the Reseller Agreement requires the parties to renegotiate or imposes a minimum purchase obligation. Instead, either party could terminate the Agreement at the end of the initial term or any renewal term by providing ninety days' written notice. (Reseller Agreement § 7.1; Dfts.' Mem. at 3.) A damages model built on a hypothetical renegotiated agreement, rather than the agreement the parties actually made, rests on the type of "unrealistic and contradictory" assumption that warrants exclusion under *Boucher*. *Boucher,* 73 F.3d at 21.

The projected duration of the parties' relationship presents the same problem. The Experts projected that the relationship, or a renegotiated version of it, would continue for ten to thirteen years after the alleged breach. (Report at 8, 10-12.) Yet the Report itself acknowledges that the parties last communicated in 2013 and that Calltrol has performed no maintenance services for

LoxySoft since that year. (Report at 7.) Over the course of the parties' relationship, LoxySoft purchased approximately 12,500 licenses, a volume consistent with a stable and finite customer base. (Dfts.' Mem. at 20.) The Report never analyzes how many additional licenses LoxySoft would have needed to purchase to generate those projections, and Dr. Rodriguez confirmed that the damages estimate does not contemplate any particular number of licenses. (Rodriguez Tr. 36:4-8, Wrobel Decl. Ex. G, ECF No. 178-7; Dfts.' Mem. at 20.) The model assumes tens of thousands of additional license sales without considering whether there was any market for those licenses. That assumption is difficult to reconcile with either the Agreement or the record. *See Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452, at *9−10 (S.D.N.Y. Mar. 30, 2020) (excluding damages expert whose methodology contradicted the express terms of the plaintiffs' contracts and produced greatly inflated estimates).

Plaintiff responds that LoxySoft never exercised its termination right and that the Agreement therefore remains in force. (Pl.'s Opp. at 16−18.) But whether the contract was terminated is not the dispositive question. The relevant question is whether the Experts applied their methodology to the agreement the parties actually made, and they did not. Because the methodology was not reliably applied to the facts of this case, exclusion is independently warranted under Rule 702(d).

## III. The Experts' Opinions Are Not Based on Sufficient Facts or Data

Finally, the problems with the Report are not limited to the Index and its application. Rule 702 also requires expert testimony to be "based on sufficient facts or data." Fed. R. Evid. 702(b). An expert may rely on unaudited, client-provided data if experts in the same field would reasonably rely on such materials. *See* Fed. R. Evid. 703. But the expert must be able to explain and account for the data used. *See R.F.M.A.S.,* 748 F. Supp. 2d at 257 (excluding an expert who relied on a

summary prepared by counsel without independent verification). Here, the income figures that anchor the damages model come from a one-page summary of Calltrol's reported foreign income. (Wrobel Decl. Ex. E, filed under seal at ECF No. 179.) At her deposition, Ms. Kucsma could not reconcile the summary's figures with those in the Report. The summary reported a 2010 loss of $42,836, while the Experts used a $160,917 income figure for that year, and she confirmed that she never reviewed the underlying shareholder tax returns. (Kucsma Tr. 152:13–153:13, Wrobel Decl. Ex. B, ECF No. 178-2; Report at 10.) Plaintiff's explanation, that the negative figure reflected a one-time bank failure, comes from counsel's opposition brief, not from the Report or the Experts' testimony. (Pl.'s Opp. at 12.) The Experts' inability to account for the income figures anchoring the damages model reinforces the conclusion that their opinions must be excluded.[4]

**CONCLUSION**

For the foregoing reasons, Defendants' motion to exclude the testimony and Report of Plaintiff's damages experts, Kristin K. Kucsma, M.A. and A.E. Rodriguez, Ph.D., is GRANTED. Accordingly, the Report and the Experts' testimony are excluded in their entirety.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 176. The stay of the summary judgment briefing schedule entered pursuant to the Court's October 3, 2025 Order (ECF No. 166) is hereby LIFTED. Defendants shall file their anticipated motion for summary judgment on or before September 17, 2026. Plaintiff shall file its opposition on or before

---

[4] The Court does not rely on Defendants' remaining Rule 702(b) arguments. First, Defendants contend that the Experts improperly disregarded Calltrol's costs and historical profitability. (Dfts.' Mem. at 15–16.) Lost profits, however, are measured by deducting from but-for revenue the incremental costs the plaintiff avoided by not making the lost sales, not its fixed costs, which it would have incurred regardless of the breach. *See* Gaughan, *Measuring Business Interruption Losses* at 326-27, Zimmerman Decl. Ex. 1, ECF No. 180-3. The record supports the Experts' treatment of Calltrol's incremental costs as de minimis: Calltrol's tax filings reported cost of goods sold averaging 0.5 percent of revenue from 2010 to 2012, and Ms. Kucsma testified that her analysis focused on the incremental profits attributable to the parties' relationship. (Report at 11; Kucsma Tr. 35:14–36:1, Wrobel Decl. Ex. B, ECF No. 178-2.) Second, Defendants argue that the Experts failed to account for alternative causes of Calltrol's decline, such as product obsolescence and the loss of other resellers. (Dfts.' Mem. at 17–19.) Because exclusion is warranted on the grounds discussed above, the Court does not reach this argument.

November 2, 2026. Defendants shall file their reply, if any, on or before November 17, 2026. The parties shall otherwise comply with the Court's Individual Rules of Practice governing summary judgment motions.

SO ORDERED:

Dated: August 4, 2026
White Plains, New York

NELSON S. ROMÁN
United States District Judge